Filed 08/19/25

VERMONT SUPERIOR COURT

Washington Unit
65 State Street
Montpelier VT 05602
802-828-2091
www.vermontjudiciary.org



CIVIL DIVISION

Case No. 23-CV-02770

Monika Andrzejkiewicz v. Old High School Condominium Association, Inc.

## Opinion and Order Following Trial on Remaining Claims

On July 1, 2025, this matter came for final hearing before the Court. Plaintiff was present and represented herself. Defendant was present through Ms. Sarah Morin, President of the Board of the Old High School Condominium Association (the "Board"). Defendant was also represented by Attorney Huessy. As of the time of trial, the remaining claims in the case concerned: (1) Plaintiff's assertion that Defendant was responsible for the repair of a clog in her drain that occurred in early 2023; and (2) that the Defendant should be required to repair air infiltration that has been occurring in her apartment for a number of years and compensate her for any loss of enjoyment of her condominium from that experience. Defendant maintained that it had already reimbursed Plaintiff for the plumbing repair along with 10% interest. As a result, it argued that the claim was moot. The Plaintiff disputed those points. The Court makes the following determinations.

### I.  Findings of Fact

Plaintiff purchased a condominium in Defendant's building in 2021. She and her son moved in during October 2021. At that time, Chris Woods, a member of the

1

Board, told her in passing that there were unspecified issues with the maintenance of the building.

In or about February 2023, a clog developed in Plaintiff's kitchen sink. It caused water to back up into the sink. Ed Read, a member of the management company then employed by Defendant to maintain the building came to try to fix it. He was unable to do so. Another company, Kingsbury Contracting, came and was also unable to repair the problem. Kingsbury charged a fee to Plaintiff for the failed repair, but Defendant eventually paid that bill. There's no claim for reimbursement of such fees in this case.

Plaintiff then contacted a local contractor, Mr. Barbour, to try to unclog the drain. He came and snaked the drain but the plug was too far from Plaintiff's condominium for his equipment to reach it. He called Roto-Rooter. A gentleman from Roto-Rooter came and snaked the drain. He determined that the clog was further down the pipe and into a common pipe in the building. With a longer snake implement he was able to break the clog. Plaintiff watched through a drain camera as he made the repairs. Plaintiff estimated that the clog was thirty feet beyond her condominium. On February 6, 2023, Roto-Rooter charged Plaintiff $615.00. Plaintiff asked Defendant to pay for the repairs. It refused.

There was general dispute during this lawsuit over whether the clog occurred in a pipe servicing only Plaintiff's unit, which Defendant says would be her responsibility to repair, or whether it occurred in a main or semi-main pipe that served other units. The relevant Vermont law and the Amended Declaration of the

2

Condominium Association documents describe the latter two types of pipes as common and limited-common elements of the building. *See* 27A V.S.A. § 3-107(a), Uniform Law Comments ¶ 1.

Ms. Morin's testimony suggested that no other owners complained regarding the clog, so her view was that the clog was in a pipe that solely serviced Plaintiff's unit. The persuasive evidence at trial, however, shows that the pipe was far from Plaintiff's unit, was not one solely servicing Plaintiff's condominium, and was in a main pipe serving the building. Plaintiff's testimony and that of Mr. Barbour as to the nature and location of the clog support that conclusion. Further, as Plaintiff argued, it may be that another owner who may have been impacted by the clog may not have been present to complain at the time the clog occurred. Accordingly, the Court finds that it was a common element of the building that should have been repaired by the Defendant.[1]

At trial, Ms. Morin indicated that the Defendant credited Plaintiff's account for the $615.00 on or about June 9, 2025. The evidence confirms that, at that time, Defendant credited Plaintiff for the repair and 10% interest for total credit of:

---

[1] Even if Ms. Morin's view were given more weight, as noted in the Court's summary judgment ruling, the pipe would still be a limited-common element. Under Vermont law, a limited-common element is treated as a common element unless the "Declaration" sets another standard. 27A. V.S.A. § 3-107(a); Uniform Law Comments ¶ 1; 27A V.S.A. § 3-115(c)(1). While Section 3.2(a) of Defendant's Bylaws does make a different proviso for such maintenance costs, the Declaration does not. The Declaration merely refers back to general Vermont law. *See* Amended Declaration §5(c). As a result, Section 3-107(a) controls. *See also* 27A V.S.A. § 2-103(c) ("If a conflict exists between the declaration and the bylaws, the declaration prevails except to the extent the declaration is inconsistent with this title.").

3

$775.87. Defendant asserted that it wanted to pay the bill for a lengthy period during the litigation but that Plaintiff refused to produce it. The case record shows, however, that Plaintiff filed the Roto-Rooter bill early in this case.

Plaintiff further claimed that the clog had inconvenienced her by limiting her use of her kitchen sink prior to the repairs and had caused her to buy more take-out meals than usual during that period. Such alleged costs were not specified in any detail, however.

B.    Air Infiltration

Plaintiff also had issues in her condominium concerning air infiltration from the outside. Cold breezes waft into her bedroom and her son's bedroom in the winters. Sometimes they cause ice to build up on windows and have led to moisture in those locations. Plaintiff asserted that this was due to the fact that the condominiums were constructed over an old high school that was built in 1830, that it had spotty insulation, and that the outer walls of the building were in disrepair and had holes. Mr. Barbour supported that view. Plaintiff eventually bought some additional heating units to warm her unit.

Plaintiff claimed at trial that, in February 2023, Mr. Barbour had offered to "fix" the air problem by blowing foam insulation into the outer wall at her condominium. Plaintiff stated that she asked the Defendant for permission to do that at her own expense, and it refused. Ms. Morin testified and denied that they had refused such a request. She maintained that the exchange between them occurred in January 2023, not February 2023. She stated that the Defendant had

4

asked Mr. Barbour and Plaintiff for additional information, which was never forthcoming.

Ms. Morin also persuasively stated that the Defendant believed the drafts were an issue that impacted the "whole side" of the building and that it affected other owners and not just Plaintiff. No documentary evidence fully supports either view. Nor does the record show any formal request by Plaintiff for a special meeting of the board to discuss the air infiltration issue. Although Mr. Barbour's testimony indicated the air infiltration could be fixed, he did not describe any efforts to gain permission from Defendant to do so. Further, Plaintiff and Mr. Barbour did not provide any estimates of costs for such repairs. The Court finds that the evidence, at best, hangs evenly in that regard. As a result, the contention that Defendant refused to allow Plaintiff to effect repairs is not proven.

Looking at the issue more broadly, Ms. Morin acknowledged that Plaintiff likely suffers the types of air filtration described above. She noted, though, that many other owners are in the same position, including herself. She credibly testified that there are few owners in the building, that dues were historically too low to create reserves to maintain the building, that repairs for all had been deferred, and that much work is needed. Most repairs require a "special assessment" to raise the money to implement them, and the Defendant has to be sensitive to imposing too-high fees on the owners.

Ms. Morin described in detail the efforts Defendant has been making on such issues. In May 2022, the owners approved of the Board's request that it hire

engineers who would make an evaluation of the building. The Request for Proposals for such work was approved by the owners in September 2022. The plan was to retain a professional engineer to assess the maintenance issues with the building and attempt to triage them as a first step in developing a capital improvement plan. Plaintiff was aware of these efforts.

In May 2023, prior to the initiation of Plaintiff's lawsuit, Defendant hired Criterium Engineers to do the assessment. Exhibit 1. The firm completed their analysis in August 2023. Exhibit 9. They concluded that the building, though needing maintenance, was in generally good/fair shape. The primary issues that needed immediate attention were a portion of the roof that needed repair and a water heater that needed to be replaced. Of less urgency, the Report noted that the exterior of the building had rot and was otherwise in need of repair as well. Those repairs included Plaintiff's side of the building and all others. Exhibits 5 and 8 confirmed that the disrepair on the sides of the building was not limited to the side where Plaintiff's condominium is located.

Ms. Morin also credibly testified that, due to the small number of units and the costs of repairs, the Defendant concluded that the group could not afford to do all of the fixes at once. The costs to repair the sides of the building was estimated at $60,000.00. Instead, the Board decided to triage by fixing the most immediate problems—the roof and the heater. Following that, it determined to renovate each side of the building in succession. The Board chose to repair Plaintiff's side of the building first.

6

In September 2024, the Defendant approved a special assessment to repair Plaintiff's side of the building. The assessment was to be divided into four payments by the owners of approximately $1,342.40, which were to be due in December 2024, January 2025, March 2025, and April 2025. (The Defendant waived the Plaintiff's obligation for the first two payments after she filed bankruptcy in January 2025 and was subsequently discharged.)

Plaintiff conceded at trial that there are a lot of maintenance issues with the building, that maintenance had been deferred for years, and that dues had been too low. She maintained, however, that she had somehow been singled out for different treatment regarding maintenance and numerous other financial assessments, late fees, and liens. She contended that the Board had malice towards her and mistreated her, causing her extreme anxiety and other ills. Ms. Morin disputed those facts and maintained that the Defendant had acted evenhandedly towards Plaintiff and had fairly followed the terms of Vermont laws, the Declaration, and the Bylaws. The weight of the evidence supports Defendant's position. The evidence does not show that Plaintiff was singled out for mistreatment or otherwise discriminated against by Defendant.

II.     Analysis

A. The Clogged Drain

Plaintiff has established that the February 2023 clog was in a main pipe of the building. Under Vermont law, such a common element is the responsibility of

7

Defendant to repair. 27A V.S.A. 3-107(a). Plaintiff's claim for compensation for the repairs she financed is meritorious in that regard.

Defendant argues, however, that the claim is moot because they compensated Plaintiff as of June 9, 2025, for the $615.00 bill along with 10% interest, for a total credit of $775.87. The Court disagrees.

First, consideration of the merits of such a claim remains an issue as regards either side's entitlement to attorney's fees as a "substantially prevailing party." See Defendant's Bylaws § 7.7.

Second, parties who obtain court judgments for reasonably calculable amounts are entitled to 12% interest. As a result, while the Court accepts that Defendant credited Plaintiff the sum of $775.87 on June 9, 2025; to be made whole Plaintiff is entitled to interest of $172.51 (12% interest from February 6, 2023 to June 9, 2025). The total amount owed to Plaintiff as of that date was: $787.51. Given that Defendant credited Plaintiff with $775.87, Defendant still owed Plaintiff $11.64, as of that date and $11.88 as of today's date of judgment.[2]

B.    Air Infiltration

The Court has little doubt that Plaintiff has lived through air infiltration into her unit, which has inconvenienced her and her son and their enjoyment of their

---

[2] To the extent Plaintiff also sought damages for the inconvenience and the additional meals purchased while the drain was out of use, the Court finds that the evidence on those points at trial provides an insufficient and unspecified basis upon which to attempt to calculate damages. *See Lemnah v. American Breeders Serv., Inc.*, 144 Vt. 568, 580 (1984) (factfinder must be able to assess damages with "reasonable certainty").

home.  Defendant has countered that such concerns and problems are not unique to Plaintiff, are shared by other owners, and are being addressed as best Defendant can under the circumstances.  It relies on the "business judgment rule" to defend its choices.  The Court agrees that the Rule bars Plaintiff's claims.

As noted in the Court's ruling on summary judgment, in general, decisions made by the Association's executive board are protected by the business judgment rule.  *See* 27A V.S.A. § 3-103, Uniform Law Comments ¶ 6.  "So long as the board acts for the purposes of the [association], within the scope of its authority and in good faith, courts will not substitute their judgment for the board's.  Stated somewhat differently, unless a resident challenging the board's action is able to demonstrate a breach of this duty, judicial review is not available." *Levandusky v. One Fifth Ave. Apartment Corp.*, 553 N.E.2d 1317, 1322 (N.Y. 1990), cited generally in 27A V.S.A. § 3-103, Uniform Law Comments ¶ 6.

As one authoritative source has stated:

> The business judgment rule limits the judicial review of decisions made by a condominium's board of managers to whether the board's actions are authorized and whether the actions were taken in good faith and in furtherance of the legitimate interests of the condominium.  It can be gleaned from the case law that so long as a condominium board acts for the purposes of the condominium, within the scope of its authority and in good faith, the courts will not substitute their judgment for that of the board's.

*Application of Business Judgment Rule to Decisions by Real Estate Condominium or Cooperative Corporations*, 9 A.L.R.7th Art. 5.

Here, the persuasive evidence shows that the Defendant has been using reasonable and fair efforts to make repairs of an older building that has few owners.

9

The Board sought owner input and approval to hire an engineering firm to make an impartial and professional assessment of the needed repairs of the buildings. It prioritized its decisions as to repairs consistently with that report. As to fixing the outer walls, which is the subject of this claim, it relied on the report, chose to repair one side at a time, ordered a special assessment to fund the repairs, and decided to repair Plaintiff's side first. There is nothing in that process that would place such decisions outside of the protections of the business judgment rule.

Plaintiff is correct that discriminatory treatment by a board or the targeting of one person for mistreatment would not fall within the proper scope of business judgment. *See Application of Business Judgment Rule to Decisions by Real Estate Condominium or Cooperative Corps.,* 9 A.L.R.7th Art. 5 (2016) (actions that treat an individual differently than similarly situated persons, are based on fraud or self-dealing, or are arbitrary and capricious are not protected by the business judgment rule). In this case, however, such a claim fails for lack of proof. The Court was not presented with persuasive evidence that Plaintiff was treated in a discriminatory manner or that the Defendant acted against her in any way that is not well within the bounds of the business judgment rule. The strong weight of the evidence shows that Defendant treated Plaintiff as it did other owners, that its decisions were motivated by the welfare of all owners, and that its approach to addressing previous failures to maintain the building is based on sound facts and exercise of judgment.

As a result, Plaintiff has failed to establish that Defendant is liable in any way to her for its decision to repair the air infiltration issues at the building as it

10

has chosen to. Plaintiff purchased a condominium unit in a building that had few owners, had low dues, and was not particularly well maintained. The record shows that she is in the same boat as other owners, is treated no differently than them, and that the Defendant is taking responsible steps to improve the building for all.

III.    Attorney's Fees

As set forth above, Defendant has an outstanding liability to Ms. Andrzejkiewicz for additional interest related to the plumbing repair, and both parties seek attorney's fees per Section 7.7 of Defendant's Bylaws: the "substantially prevailing party" in an action arising under the association's governing documents is entitled to "reasonable attorney's fees." At the end of the final hearing, as reflected in a July 3 Entry, the Court requested additional briefing from the parties as to "how the Plaintiff's bankruptcy may impact the Court's consideration of the claims for relief in this action, including the Court's assessment of substantially prevailing parties." Ms. Andrzejkiewicz filed the bankruptcy case while this case was pending; the bankruptcy trustee never intervened in this case and abandoned it to her; and she resumed the litigation of this case following discharge. Ms. Andrzejkiewicz expressly sought an award of fees in her pre-petition complaint, and Defendant expressly sought an award of fees in its pre-petition answer.

Both parties submitted additional, though laconic, briefing. The parties agree that the bankruptcy discharged any pre-petition debts to Defendant, including any potential right to attorney's fees incurred pre-petition. Defendant

11

argues that the bankruptcy did not, however, discharge its right to attorney's fees incurred in this case post-petition. Ms. Andrzejkiewicz did not address that matter.

As to post-petition fees, Defendant relies on the "return to the fray" principle of *In re Ybarra*, 424 F.3d 1018 (9th Cir. 2005), but does not provide any substantial legal analysis in support of applying that case here. As Defendant frames it, when a litigant is involved in state court litigation involving a potential right to attorney's fees, then petitions for bankruptcy, and then resumes the state court litigation, claims properly discharged in bankruptcy will include any subsequent award of attorney's fees incurred pre-petition but not those incurred post-petition because the debtor voluntarily chose to "return to the fray" of the state court suit. Such a debtor, Defendant argues, should not be allowed to use her bankruptcy as a sword to engage in risk-free litigation.

Such a position arguably may have a sound policy basis. As a bankruptcy court, resolving an analogous issue—largely on policy grounds—explained long before *Ybarra*:

> A principal goal of bankruptcy is to provide the debtor with reasonable exemptions and a fresh start. Allowing the debtor to discharge attorney's fees incurred in the post-petition pursuit of dubious claims [in litigation that was initiated pre-petition] might invite egregious abuses, while not allowing discharge of attorney's fees might prevent debtors from pursuing "reasonable exemptions" which are in the form of lawsuits. The balance must be struck so that post-bankruptcy acts on the part of the debtor cannot be undertaken with impunity. This follows from the general principle that only liabilities arising from pre-petition acts are discharged in bankruptcy. If the debtor chooses to enjoy his fresh start by pursuing pre-petition claims which have been exempted, he must do so at the risk of incurring the post-petition costs involved in his acts.

12

*Matter of Hadden*, 57 B.R. 187 (W.D. Wis. 1986). However reasonable such a conclusion may seem, unmoored from the operative language of the bankruptcy statutes, it provides no compelling basis for an award of post-petition fees to Defendant in this case. Indeed, the language of the bankruptcy laws point decidedly in the other direction.

A claim subject to discharge in bankruptcy includes any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, *contingent, matured, unmatured*, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5) (emphasis added). "In interpreting this provision, the United States Second Circuit Court of Appeals has held that 'the term 'claim' is sufficiently broad to encompass any possible right to payment.'" *Conway Hosp., Inc. v. Lehman Bros. Holdings Inc.*, 531 B.R. 339, 342 (S.D.N.Y. 2015) (quoting *Mazzeo v. United States*, 131 F.3d 295, 302 (2d Cir. 1997)). In unresolved pre-petition litigation involving a potential right to attorney's fees, that unliquidated, contingent, unmatured, or disputed right to fees generally is a "claim" for purposes of § 101. *See* 3 William L. Norton III, *Norton Bankr. L. & Prac.* 3d § 58:1 ("The discharge injunction will normally preclude claims for post-petition attorney's fees stemming from litigation that was commenced pre-petition but continued post-petition.").

Defendant's contrary position relies heavily *Ybarra* and its view of the notion of "return[ing] to the fray." That interpretation of the bankruptcy code, which may be fair on the face of the decision, is demonstrably overbroad in light of subsequent

13

9th Circuit case law. Ybarra initiated a pre-petition state court lawsuit, but the trustee settled it over Ybarra's objection during bankruptcy proceedings; the state court lawsuit was dismissed. Ybarra then amended the schedule of exempt property to add the cause of action against the creditor. The bankruptcy appeals panel reversed the bankruptcy court's ruling that had sustained the creditor's objection to the exemption. On remand, Ybarra elected to take ownership of the state suit rather than assent to the settlement. Ybarra then persuaded the state court to reopen the state case, eventually leading to judgment in the creditor's favor and a substantial award of attorney's fees.

On review before the 9th Circuit, the Court, based on prior case law, treated the subsequent state lawsuit as warranting an award of post-petition attorney's fees. With superficially broad language, it summarily concluded:

> In sum, we have held that post-petition attorney fee awards are not discharged where post-petition, the debtor voluntarily "pursue[d] a whole new course of litigation," commenced litigation, or "return[ed] to the fray" voluntarily. We have also endorsed the notion that by voluntarily continuing to pursue litigation post-petition that had been initiated pre-petition, a debtor may be held personally liable for attorney's fees and costs that result from that litigation.

*Ybarra*, 424 F.3d at 1024 (citation omitted). Defendant argues that Ms. Andrzejkiewicz's resumption of her suit against it was just such a return to the fray because she could have simply dismissed her unresolved claims and avoided any post-petition fees.

As explained in a subsequent case, however, Defendant's interpretation of *Ybarra* is oversimplified and overbroad. In *In re Castellino Villas, A. K. F. LLC*, 836

14

F.3d 1028 (2016), the Court explained its more general case law to the effect that a claim will be treated as arising pre-petition, and thus subject to bankruptcy protection, under its "fair contemplation" test. "Under this test, 'a claim arises when a claimant can fairly or reasonably contemplate the claim's existence even if a cause of action has not yet accrued under nonbankruptcy law.'" *Id*. at 1034. The court explained:

> [I]f a creditor and debtor are engaged in prepetition litigation pursuant to a contract that includes an attorneys' fees provision, and the creditor "can fairly or reasonably contemplate" that it will have a claim for attorneys' fees if an "extrinsic event" occurs (that is, if it prevails in the litigation), then the creditor's claim for attorneys' fees will be discharged in the debtor's bankruptcy even if the creditor incurs attorneys' fees after the debtor was discharged.

*Id*. As far as that goes, the conclusion is generally consistent with the principle that post-petition fees typically are discharged in bankruptcy.

The *Castellino Villas* Court proceeded to explain why, at least in its view, *Ybarra* and another case were consistent with the above principles. It concluded:

> The analysis in these cases is consistent with our fair contemplation test. When parties engage in prepetition litigation that could lead to an award of attorneys' fees, they may fairly contemplate that the prevailing party will be awarded those fees. Therefore, a creditor's contingent claim to such fees is discharged in bankruptcy, even if some fees are incurred post-petition. But when the prepetition litigation is resolved in bankruptcy so that any claim (including a contingent claim for attorneys' fees) against the debtor would be discharged, we cannot say that the debtor's affirmative action to commence what amounts to "a whole new course of litigation," was in the fair contemplation of the parties when the debtor filed a bankruptcy petition. Rather, the debtor's decision to eschew the fresh start provided by bankruptcy and engage in new litigation is more akin to post-petition conduct that, by definition, was not in the fair contemplation of the parties prepetition.

*Id*. at 1035–36 (citations omitted; emphasis added).

15

In other words, in *Ybarra*, there was something of a clean break between the pre-petition and post-petition litigation that caused post-petition fees to not be discharged. *See generally In re Residential Capital*, LLC, 558 B.R. 77 (S.D.N.Y. 2016) (untangling the matter, and rejecting *Ybarra*, in great detail).

Whatever one may think of this Ninth Circuit case law, even if the Court were to apply it here, it would not lead to the conclusion advocated by Defendant. The potential right to attorney's fees in this case was expressly contemplated by both parties at the outset of the pre-petition state court litigation, and nothing happened after the bankruptcy petition that might reveal any lack of fair contemplation that the state court litigation might result in an award of fees. Whether relying on the express language of the bankruptcy statutes or the Ninth Circuit's interpretation, Defendant's claim for fees was discharged in bankruptcy.

This leaves to be determined whether Ms. Andrzejkiewicz may be the substantially prevailing party in this case. She is not.

"[I]dentifying the substantially prevailing party is a matter for the trial court's discretion and cannot be reduced to merely calculating the net verdict." *Fletcher Hill, Inc. v. Crosbie*, 2005 VT 1, ¶ 15, 178 Vt. 77, 83. "Instead, the trial court should apply 'a more flexible and reasoned approach focused on determining which side achieved a comparative victory on the issues actually litigated or the greater award proportionally to what was actually sought.'" *Sweet v. St. Pierre,* 2018 VT 122, ¶ 20, 209 Vt. 1, 11 (citation omitted). Generally, courts should determine "who was the substantially prevailing party as a whole, considering all

16

the claims together." *J & K Tile Co. v. Wright & Morrissey, Inc.*, 2019 VT 78, ¶ 37, 211 Vt. 179, 194.

By the time this case reached the summary judgment stage, it was apparent that the pleaded claims were that "the Association: (1) has failed to identify and assign two parking spaces for exclusive use by her and her guests; (2) has failed to reimburse her for a plumbing repair for which the Association was responsible; (3) has failed to keep the parking lot and sidewalks clear of snow, ice, and debris; (4) has failed to reimburse her for a $1,510.20 special assessment; and (5) has failed to repair the 'drafts and air infiltration' in the bedrooms of her unit." Decision on Summary Judgment at 1–2 (filed July 19, 2024). Either on summary judgment or at trial, all these claims have been resolved in Defendant's favor other than the plumbing repair ($615).

Ultimately, Ms. Andrzejkiewicz established her entitlement to a relatively small damages award, even acknowledging the full amount credited to Plaintiff's account relating to the plumbing event. Comparing that to the many claims resolved in Defendant's favor, however, it is manifestly clear that Defendant is the substantially prevailing party. Ms. Andrzejkiewicz is not entitled to an award of fees in this case.

For similar reason as regard the claim for attorney's fees, the Court orders that each side shall bear its own costs.

A separate judgment order shall issue.

17

Electronically Wednesday, August 13, 2025, per V.R.E.F. 9(d).


_____

Timothy B. Tomasi
Superior Court Judge

18